**Mattie Lou RAMOS, Appellant,**

v.

**Jose Enrique RAMOS, Appellee.**

**No. 5766.**

District of Columbia Court of Appeals.

Argued Feb. 28, 1972.

Decided April 26, 1972.

Peter A. Greenburg, Washington, D. C., for appellant.

Charles B. Sullivan, Jr., Washington, D. C., for appellee.

Before GALLAGHER, NEBEKER and REILLY, Associate Judges.

REILLY, Associate Judge:

After only two and a half months of marriage, appellant-wife left the marital abode and sued for annulment or divorce. Some 20 months later the case came to trial in the Court of General Sessions. At the close of plaintiff's evidence the husband moved for dismissal for failure to make a prima facie case. The court granted the motion, making detailed findings and conclusions of law. On appeal, the wife argues that under all the circumstances she has made a prima facie case for annulment on the ground of fraud or

for an absolute divorce on the ground of constructive desertion for one year or for a limited divorce on the ground of cruelty.

Husband and wife were married in the District of Columbia on May 14, 1968. At the time of the marriage the husband was 32 years of age and the wife, 69 years of age. She was the widow of a local doctor from whom she had inherited in 1964, sole title to a large single-family dwelling in the Chevy Chase section of the District and was living there alone at the time she met her present husband. The latter was an instructor at a dancing school in the District where the wife had enrolled for dancing lessons. About two years after the first husband's death, the instructor and the widow began a courtship. In a two-year period immediately preceding their marriage, the widow parted with at least $14,000 in favor of her suitor, pursuant—as the trial court found—to his importunings.

The trial court made other findings which may be summarized as follows:

Following the marriage of the parties, the husband commenced residing at the wife's house. Shortly thereafter, he encouraged her to change ownership of this property to give him a one-half interest and, although she was reluctant to do so, she nevertheless executed deeds for this purpose.

The wife also agreed, somewhat reluctantly, to have her checking account transferred into the joint names of the parties. Within two months the husband drew three checks totaling in excess of $800, thereby to her consternation overdrawing the account.

The wife provided funds for the husband's daily expenses. When her money became depleted (as a result of her husband's expending it), the wife subsisted on sandwiches brought by her sister but continued to prepare food for the husband in order to induce him to come home and continue their marital life. The husband came home frequently between eleven o'clock at night and four or five in the morning.

The husband requested the wife to allow him to move his uncle and an elderly woman, another of the husband's pupils, into their home, both of which proposals the wife rejected.

On July 18, 1968, the husband requested her to make him beneficiary of her life insurance policy. When she refused, she testified that he slapped her severely on the left arm, resulting in bruises.[1] Following this incident the parties continued to reside together only until the wife left the marital domicile on August 1, 1968.

The wife's reasons for leaving the husband were (1) he had not proved to be the loving husband she had been led to expect; (2) he had not taken her to as many social events as she wished; (3) she no longer trusted him; (4) she had lost six pounds in two and a half months and had become nervous; (5) she was no longer able to get into her strongbox as the key was in her husband's possession; and (6) she was fearful of him by reason of the incident of physical abuse.

The court concluded as a matter of law that the wife had failed to make a prima facie case either for an annulment based on fraud or for an absolute divorce based on constructive desertion for one year.

In an order amending the court's conclusions made at the wife's request, the court found in addition that (1) the wife condoned the husband's physical abuse by continuing to live with him for two weeks without conduct on her part manifesting fear for her well-being; (2) her six-pound weight loss was minor; and (3) the letters written to the husband after their separation together with her continuing payment of his bills were actions inconsistent with

---

1. In describing this portion of appellant's testimony, the trial court failed to mention that the witness also said that this blow had shattered a bone.

any of the several alternative grounds for divorce or annulment.

A careful review of the record reveals that the court did not view the evidence in the light most favorable to the plaintiff, as it must in ruling on a motion to dismiss for failure to make a prima facie case.[2] The wife testified (1) that when she learned that the husband had overdrawn her checking account, she fainted; (2) that he threatened persistently to leave her if she did not allow his uncle and one of his dancing pupils to live in their home; (3) that her weight loss of six pounds left her 20 pounds under normal weight; (4) that when the husband struck her in their quarrel over her insurance policy he hit her as hard as he could and broke a small bone; and (5) that after seeing an attorney she did not return home because she feared for her life. Her daughter testified that she saw her mother twice between the time the husband struck her and the time she left, that on her first visit her mother was "very upset" and that on the second visit—

> She was really hysterical. She was beside herself. She didn't know what to do. She really didn't know where to turn. She was in an awful state, and I was just astounded that she had not told me, you know, what was happening to her. She had kept it to herself the whole time.

The daughter also testified that she had never seen her mother so thin. In addition, there was testimony tending to prove that the husband refused to acknowledge her as his wife before relatives and friends, that he maintained liaisons of an unspecified nature with various "girl friends", and engaged in other conduct offensive to her.

The court instead weighed the evidence, determining "the facts and the law" as if ruling on a motion to dismiss under General Sessions Civil Rule 41(b). We might be disposed to consider this harmless error,[3] did we not find error in the trial court's conclusions of law that the wife condoned the husband's physical abuse, and that her loss of weight was "minor", by which we understand the court to mean that such loss was of no legal significance.

As a general matter, condonation is not so readily inferred against a wife as against a husband, because a wife is more likely to be forced by fear or economic necessity into remaining on the premises.[4] She is not required to leave the common abode immediately on the commission of an act of physical abuse to avoid an inference of condonation.[5]

In the instant case, the court found that the wife was struck by her husband on July 18, and that she left the marital abode August 1. That an elderly woman, not sophisticated in the law, holding old-fashioned views regarding divorce, who had lived since 1939 in the house she had bought with the help of her former husband, did not leave it until two weeks after an act of physical abuse but on the same day she first consulted counsel, does not constitute condonation. That she remained somewhat mesmerized by her young husband, whose true profession seems to be the separation of widows from their pittances,[6] that she wrote him letters and

---

2. *E. g.*, Warner Corporation v. Magazine Realty Co., D.C.App., 255 A.2d 479 (1969); Hamilton v. Blankenship, D.C. Mun.App., 173 A.2d 737 (1961); and Carow v. Bishop, D.C.Mun.App., 50 A.2d 598 (1946).

3. *But see* Nadell v. Nadell, D.C.Mun.App., 131 A.2d 921 (1957).

4. 1 W. Nelson, Divorce and Annulment 376 (2d ed. 1945); Annot., 32 A.L.R.2d 107 at 127 (1953).

5. *See* Hammond v. Hammond, 91 U.S.App. D.C. 100, 198 F.2d 529 (1952).

6. Called as an adverse witness by the wife's counsel, the husband acknowledged

paid his bills, does not in our view impugn her corroborated testimony that she desperately feared him.[7]

The standard to be applied in deciding whether a course of conduct amounts to cruelty so as to support a limited divorce or constructive desertion is, we think, best stated in the leading case of Waltenberg v. Waltenberg, 54 App.D.C. 383, at 384–385, 298 F. 842, at 843–844 (1924):

> It is difficult to lay down any definite rule as to what constitutes cruelty within the provisions of this statute. It is clear, we think, that it is not necessary that the conduct be limited to such physical treatment as would endanger life or health. While there are two instances of assault in the present case, even this is not necessary, if other conditions are present, to bring the case within the statute. The conduct of the offending party, in the absence of assault, may be such as to make life intolerable, and thereby amount to such cruel treatment as to justify a decree of separation.
>
> *       *       *       *       *       *
>
> To bring the case within the statute, it is sufficient if the evidence, in the absence of physical violence, establishes conduct which creates a state of mind which operating upon the physical system produces bodily injury. . . .
>
> It appears, therefore, that the application of the statute in a given case must depend upon existing conditions. The habits and dispositions of individuals differ according to station, early training, environment, and education. Conduct on the part of one of the parties to the marriage relation, constituting cruelty toward the other, might amount to nothing more in some homes than the ordinary course of living, while in others it would constitute the very refinement of cruelty. It is for this reason that courts are unable to define definitely the term, but must be governed in applying it to the circumstances of the particular case, taking into consideration the apparent intelligence, refinement, temperament, and disposition of the parties. In some instances courts, most liberal in granting relief on grounds of cruelty, have held that among certain classes of people the exchange of blows is not detrimental to the uninterrupted continuance of the marriage relation.
>
> In the present case it appears that defendant, evidently a man of intelligence and education, was working for the government in the Bureau of Standards at a salary of $225 per month; that the wife sang in a church choir, and, so far as the record discloses, is an intelligent and refined woman. Under these circumstances the degree of abuse imposed, to constitute cruelty, may be such as would be regarded of less importance under other circumstances; but in this instance we are convinced that the record discloses a course of harsh and inconsiderate

---

that he had received a negotiable instrument in the amount of $34,000 from a Miss Sarah Doran, and 84-year-old woman, four notes not otherwise described from a Miss Gruder, one from a Miss Dorothy Keller, and an undetermined number from one Regina Peters, a 50-year-old woman, and one Carmen Felices. He admitted that some of these instruments were signed in blank, thus enabling him to fill in the amounts.

Introduced into evidence were four notes executed in the husband's favor by the wife before their marriage. The last was in the face amount of $36,000. The wife testified that she had signed it in blank on his assurance that he would fill it in with an amount in the hundreds.

When asked to explain the notes the husband said they were in payment for dancing lessors and trips, in return for personal favors, and in the case of Miss Doran " . . . because she liked me. She loved me. She is crazy about me." Tr. 34–48, 167–199, 205–216.

7. She testified that she did not return home because she feared for her life. This testimony was corroborated by her daughter. Tr. 52, 55, 124, and 129.

conduct on the part of the defendant towards his wife which justifies the interposition of a court of equity to afford relief.

Thus in Kimmell v. Kimmell, 84 U.S. App.D.C. 177, 171 F.2d 340 (1948), where the wife, a nervous woman, testified that she became more nervous and lost weight because of one instance of her husband's striking her, physical abuse of their children, threats, much shouting and rudeness to friends, the court concluded that such acts warranted award of a limited divorce.

The wife in the instant case was 69 years old when she left the marital abode and is now 73. In her former marriage of 40 years duration she had no occasion to become accustomed to the financial deprivations and rough treatment inflicted upon her by the new husband. While one blow on the arm and a course of conduct which causes a weight loss of six pounds may, under less trying circumstances, not warrant domestic relief from a court, we hold that in this case they constitute sufficient bodily injury to support a limited divorce for cruelty.[8]

We note finally that there have been no children of this marriage and that it has apparently [9] never been consummated. On the basis of the record before us, we find "no public interest to be promoted by maintaining such a union, either in form or substance". Craun v. Craun, 112 U.S. App.D.C. 145, at 147, 300 F.2d 737, at 739 (1962).

This issue has been before the District of Columbia courts for nearly four years. We direct that it be given expedited treatment on remand.

Reversed and remanded for a new trial.

8. Since the record would support a finding that the parties have lived apart for more than one year, a prima facie case has also been made for absolute divorce on the ground of constructive desertion for one year. Mazique v. Mazique, 123 U.S. App.D.C. 48, 356 F.2d 801 (1966).

9. Closing argument of husband's counsel. Tr. 233.